# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of | No. 83708-7-I (consolidated with No. 83742-7-I) |
| R.L.S., | |
| | UNPUBLISHED OPINION |
| Minor Child. | |

MANN, J. — Both parents of R.L.S. appeal the trial court's termination of their parental rights. The mother contends that the Department of Children, Youth, and Families (Department) did not timely offer her all necessary services to address her parenting deficiencies.[1] The father contends that the Department did not timely offer him all court-ordered services to address his parenting deficiencies, the trial court erred in drawing a negative inference from his invocation of his Fifth Amendment right to remain silent, and the trial court erred in determining that he was currently unfit to parent R.L.S. We affirm.

---

[1] The mother assigned error to several of the trial court's findings of fact and conclusions of law in her opening brief. But she failed to address all of them in her argument. Assignments of error to findings of fact that are not argued in a brief are abandoned on appeal. In re Marriage of Glass, 67 Wn. App. 378, 381 n.1, 835 P.2d 1054 (1992).

I

A

The mother and father have two children together: R.L.S., born in August 2018, and M.S., born in June 2020. The father has an older son, born in 2009. The mother also has an older daughter, A.M., born in 2017. In 2017, the Department filed a dependency petition as to A.M. In July 2020, the mother's parental rights to A.M. were terminated. A.M. lives with her maternal aunt.

The Department filed a dependency petition as to R.L.S. in November 2018 after he tested positive for amphetamines and opiates at the time of birth. Similarly, the Department filed a dependency petition as to M.S. after he tested positive for amphetamines and opiates at the time of birth. Both R.L.S. and M.S. were placed with the same maternal aunt as A.M.

B

On November 30, 2018, the trial court found the mother in default for failing to appear and entered a dependency order. The mother's identified parental deficiencies consisted of untreated drug and alcohol issues, untreated mental health issues, and lack of understanding of the child's developmental needs. The mother was ordered to complete a drug and alcohol evaluation, a mental health evaluation, a parenting assessment, and follow through with any recommendations from these assessments, and undergo random urinalysis (UA) testing, twice per week for 90 days. The mother was also ordered to complete intensive family preservation services upon the child's return home.[2]

---

[2] Because R.L.S. was never returned home, the mother was never referred to this service.

The mother made some efforts to engage in services after she was arrested in early 2019. When she was transferred to the Yakima County Department of Corrections in May 2019, she was able to obtain a substance use evaluation and get a bed at Triumph Inpatient Treatment. While the mother was at Triumph from June 2019 until September 2019, she was having weekly visits with R.L.S., and at a family team decision-making meeting, plans were made to start a transition home.

But because of a court date in Olympia, the mother left Triumph and was discharged early from the program. When her criminal trial was continued, Department social worker Amy Holmes arranged for the mother to return to Triumph and resume treatment where she left off. Holmes communicated with the mother's attorney and, over several days, encouraged the mother to return to treatment but the mother decided to leave Yakima.

Holmes made several more attempts to get the mother to return to inpatient treatment, first trying Seadrunar. Then in April 2020, during the mother's pregnancy with M.S., Holmes met with the mother at Swedish Ballard. Holmes accompanied the mother through intake and watched her get on the elevator for the treatment floor—but the mother immediately left the facility. The mother told Holmes that she left because she was afraid she would be arrested for her outstanding warrants if her whereabouts were known.

In September 2020, the Department assigned social worker Dominic Benavides to R.L.S.'s case. When Benavides took over, he communicated with the intake coordinator at Evergreen Treatment Center regarding a potential bed date for the mother. But the mother missed the bed date. The mother later told Benavides that she

engaged with services at Evergreen Treatment Services for a drug and alcohol evaluation in June 2021. However, the Department never received a copy. Benavides also discussed a walk-in option at New Traditions with the mother. The mother went to Evergreen for methadone treatment in 2021. At the time of trial, the mother had not completed any intensive outpatient treatment or inpatient treatment for substance use.

Both social workers referred the mother for random UAs throughout the case. They did not submit referrals while the mother was in custody or in treatment because the Department wanted to see if the parent was able to maintain sobriety out in the world. The referred providers were in locations that would be convenient for the mother. Holmes also offered to drive the mother to the locations but plans fell through.

In early 2021, Benavides received letters from 2nd Chance Recovery stating that the mother was undergoing Intensive Outpatient Treatment and completing random UAs. Benavides was suspicious because the communications from 2nd Chance didn't match what he was used to seeing from providers. The owner of 2nd Chance, James Lawrence, testified at trial that the purported employee listed on the documents submitted by the parents never worked for him. Lawrence testified that the mother had been referred to 2nd Chance for random UAs, but she never called in or showed up for UAs and had never been to 2nd Chance. Lawrence believed that the documents were fraudulent and made a complaint with the Department of Health. The Department never received proof that the mother had undergone UAs outside of a treatment setting.

The mother obtained a mental health evaluation at Catholic Community Services while she was in Yakima in 2019. The report recommended individual counseling. The mother attended two sessions and then left Yakima. This did not fulfill the

recommendations from the evaluation. Holmes tried to get the mother to reengage in counseling and provided the mother with information about Valley Cities and Behavioral Health Resources (BHR). Benavides also discussed walk-in options in King County with the mother, including Sound Behavioral Health and Valley Cities but the mother never followed through.

The mother completed a parenting assessment with Tawnya Wright in July 2019 while she was engaged in services at Triumph. However, on January 23, 2020, the mother agreed to complete a new parenting assessment because the previous assessment did not include standardized testing as the dependency order required. The mother was referred to Dr. Washington-Harvey. Dr. Washington-Harvey left a voicemail for the mother. This referral was still active when Benavides took over for Holmes. But the mother never responded and never completed a new assessment.

Holmes discussed additional services with the mother that she might find supportive and referred her to Kent Family Services to attend the parenting class, Incredible Years. And when the mother missed several classes, Holmes referred her to the next class starting in 2020 at Catholic Community Services. The mother never attended.

C

On January 18, 2019, the father entered into an agreed dependency. In the order, he agreed to complete a drug and alcohol evaluation and follow treatment recommendations, and undergo random UA testing, 3 times a week for 90 days. On February 21, 2019, following a disposition hearing, the father was also ordered to complete a domestic violence batterer's assessment and a parenting assessment, and

follow through with any treatment recommendations. The father's identified parental deficiencies consisted of untreated drug or alcohol issues, unresolved domestic violence batterers issues, and lack of understanding of the child's developmental needs.

The father was in custody from late 2018 until September 2019. And for three months in summer 2021, June to August.

Holmes made many attempts to communicate with the father. She sent service letters to multiple addresses for the father, including to his parents. She also communicated with the mother, who indicated she was living with the father, and asked her to pass sealed letters to the father. The father responded by text once in 2019, acknowledging that he had the information on how to access services. Before entry of the dependency, Holmes was able to meet with the father a few times in fall 2018. But in 2019 and 2020, Holmes only received a few text messages from the father and met with him only once. Benavides also had difficulty communicating with the father. He sent e-mails and made phone calls to a number that was sometimes inactive. He also spoke with the father over the phone through the mother when they were together.

In March 2019, Holmes met with the father while he was in custody at the Maleng Regional Justice Center (MRJC) and went over his court-ordered services. In a service letter following that visit, Holmes notified the father that she was unable to find a provider who could complete a parenting assessment while he was in custody but she would submit a referral once he was released.

Holmes made a referral for the parenting assessment to Dr. Washington-Harvey in January 2020. That referral was active until late 2020 when Benavides took over for Holmes. In 2021, Benavides worked with the father's Office of Public Defense social

worker to identify a provider that would be able to go into the jail. But because of COVID, they could not find a provider. The father acknowledged that he knew how to get in touch with Dr. Washington-Harvey in a text to Holmes in 2019. In his last communication with the father before trial, Benavides re-offered and encouraged the father to participate in a parenting assessment, but because he was no longer in King County, Benavides needed to research provider options.

Holmes first referred the father to Northwest Family Life for a domestic violence assessment in May 2019 while he was in custody. The assessment did not occur because the provider was only available in King County and the father was transferred to Thurston County. Holmes referred him again when he was out of custody.

Holmes sent the father service letters with names and locations of places where he could obtain a drug and alcohol evaluation. She also tried to find a provider willing to go into the jail but was unsuccessful. When the father was released, Holmes had almost no contact with him.

The father was "consistently clear that he was not willing to do UAs." Regardless, Holmes referred the father for UA testing in 2020 at locations close to where he was purportedly living and made multiple attempts to notify him of the referral. Benavides also made several referrals for the father to obtain UAs. Benavides received notification that the father did not show up for his random UAs. The Department never received any UAs attributed to the father.

The only drug treatment program the Department ever received information from about the father was 2nd Chance Recovery. However, 2nd Chance never sent actual UA results or supporting documentation. Like with the mother, Lawrence explained that

there were no records the father ever came to 2nd Chance and, while he was referred for UAs, he never called or showed up for them. And the documents were reported to the Department of Health as fraudulent.

While the father understood the services he was court ordered to do, he objected to many of them. The father never completed any court-ordered services.

D

The termination trial took place over 10 days between December 14, 2021, and January 6, 2022. Fourteen witnesses testified, including the mother, father, social workers Holmes and Benavides, and court appointed special advocate (CASA) Debbie Turner. The mother and father were each represented by counsel. The court provided three methods for the parents to attend trial: zoom,[3] phone, and in person. The father was present for much of the trial by phone but was often absent without explanation. And the mother was present by phone for only a small portion of trial and did not attempt to explain most of her absence. The trial court found the testimony of the father and the mother was often internally inconsistent, inconsistent with other evidence, and often not credible. The court found all other witnesses' testimony was credible.

The trial court concluded that the Department met its burden to terminate the parents' parental rights. The trial court found that all services were expressly and understandably offered or provided to the mother but "[t]he mother made no sustained progress in her services to address her identified parental deficiencies." The trial court found the mother currently unfit to parent the child, explaining the mother's "testimony, the testimony of other witnesses, and the exhibits demonstrate she is living with

---

[3] Zoom is an online platform that provides audio and video conferencing.

untreated substance abuse that is affecting her decisions and ability to fulfill her obligations." In addition, the court found little likelihood that conditions would be remedied in the child's near future.

The trial court found that all services were expressly and understandably offered or provided to the father but the father completed no services to address his identified parental deficiencies. The trial court found that the father was unfit to parent the child and that there was little likelihood that conditions would be remedied so that the child could be returned to the father in the near future. The court explained:

> The Court finds from the Father's testimony and the evidence at trial that he is living with untreated substance abuse disorder. . . . Untreated substance abuse impacts his ability to parent and would negatively impact [R.L.S.'s] emotional, physical, mental, and developmental needs. [R.L.S.] has special needs that his father is not aware of and is unprepared to address. . . . The Father has not remedied his parental deficiencies, nor has he demonstrated that he is capable of safely parenting the child and providing for the child's needs. The Father is also unable to provide those things to him due to his ongoing unaddressed substance use, unaddressed domestic violence and lack of developmentally appropriate parenting knowledge.

The trial court found continuation of the parent-child relationship diminished R.L.S.'s prospects for adoption into his current family where his siblings live and that termination was in the best interest of R.L.S.

Both parents appeal.[4]

II

We review a trial court's decision to terminate parental rights by considering "whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence." In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379

---

[4] We consolidated the appeals under No. 83708-7-I.

P.3d 75 (2016). "'Clear, cogent and convincing'" means the facts shown are highly probable. In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008) (quoting In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995)). Termination proceedings are "highly fact-specific" and we defer to "the trial court's determinations of witness credibility and the persuasiveness of the evidence." K.M.M., 186 Wn.2d at 477. We review de novo whether the trial court's findings of fact support its conclusions of law. K.M.M., 186 Wn.2d at 477.

Before parental rights can be terminated, the Department must prove the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). At issue here is the fourth element, which requires that the Department provide all court-ordered and necessary services reasonably available and capable of correcting parental deficiencies. RCW 13.34.180(1)(d). "Necessary services" are "services 'needed to address a condition that precludes reunification of the parent and child.'" K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). The Department must "identify a parent's specific needs and provide services to meet those needs." In re Parental Rights to I.M.-M., 196 Wn. App. 914, 924, 385 P.3d 268 (2016). If a claim is based on the Department's alleged failure to provide a service, "termination is appropriate if the service would not have remedied the parental deficiency in the foreseeable future." In re Parental Rights of D.H., 195 Wn.2d 710, 719, 464 P.3d 215 (2020).

Because the parents each raise arguments related to RCW 13.34.180(d), we address each individually.

-10-

A

The mother asserts that a psychological evaluation with parenting component was a necessary service and the Department failed to meet its burden under RCW 13.34.180(1)(d) when it failed to offer a referral. We disagree.

One of the mother's identified parental deficiencies was untreated mental health issues. The mother was court ordered to obtain a mental health evaluation and follow through with any treatment recommendations. The mother did complete a mental health evaluation in 2019 at Catholic Community Services. The evaluation recommended individual counseling and she had two sessions in Yakima but she did not continue with the sessions. The Department repeatedly provided the mother with information for walk-in options for mental health services including those at Valley Cities, BHR, and Sound Behavioral Health. But the mother never returned to mental health treatment and did not complete the recommendations from her assessment.

The mother points to a service letter from August 2020 where Holmes wrote, "Due to ongoing concerns regarding your mental health, the Department is recommending a psychological evaluation with parenting component. Please let me know if you would like for me to make a referral for you for this service." A psychological evaluation was never ordered in R.L.S.'s dependency. See RCW 13.34.180(1)(d) (Department must offer court-ordered services). It was also never raised in the permanency plans for R.L.S. or the dependency review hearings. This

notation in a service letter was the only reference to a psychological evaluation in R.L.S.'s dependency.[5]

Substantial evidence supports that the Department offered the mother court-ordered mental health services needed to address her untreated mental health issues. And a psychological evaluation would have required mutual agreement between the mother, the court, and the Department.  See RCW 13.34.370 (evaluations shall be performed by evaluators who are mutually agreed upon by the court, Department, and the parents' counsel).

The Department argues that a psychological evaluation was not a necessary service capable of correcting the mother's parental deficiencies within R.L.S.'s near future.  We agree.

Even where the Department inexcusably fails to offer a service to a willing parent, termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child.  In re Welfare of Hall, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983).

Here, the trial court concluded that the mother would need at least a year to treat her mental illness and substance abuse disorder before addressing her parenting deficiencies.  As a three-year-old, R.L.S.'s "near future" was approximately one month. "Even if the mother were to fully engage in her services today, she could not make enough progress to eliminate her parental deficiencies and be a safe parent for

---

[5] On September 28, 2021, while the mother agreed to an order of dependency pertaining to M.S., she did not agree to a psychological evaluation and it was set for disposition.  At the time of trial in R.L.S.'s case, the mother and her attorney had only recently agreed that she would engage in this service and agreed to a provider in M.S.'s case.  See RCW 13.34.370.

reunification with [R.L.S.] within a year." There is substantial evidence in the record to support this conclusion.

The Department provided the mother with various forms of treatment to resolve her identified parenting deficiencies, and the services were ultimately unsuccessful. The mother made minimal progress in addressing her substance use, mental health, and inadequate parenting skills. There was testimony that R.L.S. needed immediate stability and permanence. R.L.S. was three years old at the time of trial and had been living with his maternal aunt for his entire life.

Holmes testified that the mother would need at least a year to remedy her substance use and untreated mental health parental deficiencies. And if the mother was sober, she would need at least six months to engage in a parenting service to remedy her deficiency of lacking understanding of R.L.S.'s needs. In addition, at the time of trial, the mother was facing serious criminal charges that would affect her ability to parent R.L.S. in the future. The mother also testified that she was applying to start substance abuse treatment at Evergreen and the treatment could last between six and nine months.

There is no evidence in the record that completion of a psychological evaluation would be capable of resolving the mother's parental deficiencies within the foreseeable future.

Substantial evidence supports the finding that the Department proved by clear, cogent, and convincing evidence that all necessary services capable of correcting the mother's parenting deficiencies in the foreseeable future were offered or provided.

B

The father asserts that the Department did not reasonably offer or provide a parenting evaluation. We disagree.

The trial court found that all services ordered under RCW 13.34.136 had been expressly and understandably offered or provided to the father. The father asserts that he was not offered or provided services for 12 months following the dispositional order. The father's argument discounts that the Department offered him ample services throughout the length of the case, all of which he ignored or refused.

The father had an opportunity to engage in services before, during, and after his time in custody. Before the dependency was entered, the Department requested and the father agreed to submit to a one-time UA; however, he did not show up. While he was in custody, Holmes found a provider willing to complete a domestic violence assessment for the father at the MRJC. The father did not engage in this service. Once released, the Department re-referred the father for a domestic violence assessment. The father never completed this assessment, telling the court that he knew he was court ordered to obtain it but he "wasn't planning on doing it."

The father did not agree to complete a parenting assessment in the dependency, it was separately ordered at a disposition hearing on February 21, 2019. While the father was in custody, the Department was unable to find a provider willing to complete a parenting assessment because it was partially dependent on the correctional facility allowing R.L.S. to visit the facility. But in January 2020, once he was released, Holmes found and referred the father for a parenting assessment with Dr. Washington-Harvey. At trial, when asked if he intended on engaging in the parenting assessment, the father

told the court "nope," "I already told them from the jump I wasn't gonna engage in their services."

The Department provided the father with information on where he could go for random UAs, and made referrals, even though he repeatedly told them he would not do them. The father acknowledged that he received the information but "told them from the start that I was not taking . . . UA[s]."

Through services letters, the Department provided the names and locations of places where he could obtain a drug and alcohol assessment. The father acknowledged receiving information on how to obtain a drug and alcohol evaluation. He testified that he might have agreed to services but he "wasn't doing it." The Department referred the father to all court-ordered services but the father was not willing to engage in any of them.

The father also asserts that the trial court erred by applying a rebuttable presumption that the Department offered all necessary services when he wasn't offered the parenting evaluation for 12 months, the referral expired after 6 months, and the Department never re-offered it.

Here, the trial court found the rebuttable presumption in RCW 13.34.180(1)(e) applied "because, in the more than 12 months that [R.L.S.] has been in care, there has been a failure of the father to substantially improve any of his identified parental deficiencies and the Department has offered all of the necessary services." "Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." M.R.H., 145 Wn. App. at 25. Substantial evidence supports this finding.

By the time the referral for the parenting assessment expired, the father had been in the community for at least a year.[6] In this time, while the father had been provided with information and referrals for every court-ordered service, he refused to engage in any services. While the record establishes that the offer of services would be futile, the Department did try to work with the father's Department of Public Defense social worker and find a new referral for the parenting assessment in summer 2021 when the father was again in custody.

Finally, even where the Department inexcusably fails to offer a service to a willing parent, which is not the case here, termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child. Hall, 99 Wn.2d at 850-51.

Holmes testified that the father would need a significant period, at least a year, to remedy his parental deficiencies. And that, based on what Holmes knew of the father, it was unlikely he would engage in the services to overcome his deficiencies. At the time of trial, the father was facing serious criminal charges that would affect his ability to parent R.L.S. in the future. The father acknowledged that he was facing 250 months if he was found guilty.

Again, at the time of trial, R.L.S. was three years old and had lived with his maternal aunt for his entire life. R.L.S.'s near future was approximately one month. The father had not engaged in any services in the three years that R.L.S. was in dependency despite being out in the community for two of those three years.

---

[6] Benavides was assigned the case in September 2020 and testified that the referral to Dr. Washington-Harvey was still active when he started. The father was released from custody in September 2019 and was in the community until June 2021.

Substantial evidence supports the finding that the Department proved by clear, cogent, and convincing evidence that all court-ordered services capable of correcting the father's parenting deficiencies in the foreseeable future were offered or provided.[7]

III

The father argues the trial court erred and violated his Fifth Amendment right to silence when it drew negative inferences and relied on them to terminate his parental rights. He asserts that the trial court's finding that he was currently unfit to parent resulted from the trial court drawing a negative inference about his current substance abuse. We disagree.

Under both our state and federal constitutions, "[n]o person shall be compelled in any criminal case to give evidence against himself." WASH. CONST. art. I, § 9; U.S. CONST. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). The Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973).

Our Supreme Court recently addressed the father's exact argument in In re Dependency of A.M.F., 1 Wn.3d 407, 526 P.3d 32 (2023). In A.M.F., the mother, Y.R., was facing criminal charges at the time of trial. Upon the advice of counsel, Y.R. did not

---

[7] The father also asserts that the Department made little effort to facilitate visitation between him and R.L.S. But Washington courts have held that "visitation" on its own is not a service that must be provided under RCW 13.34.180(1)(d). In re Dependency of T.H., 139 Wn. App. 784, 792, 162 P.3d 1141 (2007).

answer questions about the last time she had used illegal drugs. A.M.F., 1 Wn.3d at 411. The trial court warned Y.R. that it might draw a negative inference from her silence and, subsequently, did draw that negative inference. A.M.F., 1 Wn.3d at 411. Based on that and other evidence presented, the trial court found the Department met the statutory factors and granted the termination petition. A.M.F., 1 Wn.3d at 411.

The Supreme Court held that the Fifth Amendment does allow the trier of fact in a civil case to make a negative inference from the assertion of the right to remain silent, unless that is the only evidence supporting an adverse action against the witness. A.M.F., 1 Wn.3d at 417 (citing Baxter v. Palmigiano, 425 U.S. 308, 317-18, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)). Accordingly, because the trial court's judgment was not based merely on Y.R.'s silence, the inference did not violate the Fifth Amendment. A.M.F., 1 Wn.3d at 417.

The father asserts that there are critical differences between this case and A.M.F. because in A.M.F. there were other indicia of the parent's drug use including testimony from the social worker, the parent's father, the CASA, and the parent's own statements. In re Dependency of A.M.F., 23 Wn. App. 2d 135, 143, 514 P.3d 755 (2022), aff'd, 1 Wn.3d 407.

Here, while the trial court indicated that it could draw a negative inference from the father's invocation of the Fifth Amendment, the record does not reflect that the trial court actually did draw a negative inference. And, significantly, the trial court's determination that the father had ongoing untreated substance abuse disorder was not based merely on the father's silence.

Holmes testified that in conversations with the father, he told her he had a long history of substance use and a long family history of substance use. During his testimony, the father admitted that he became addicted to Percocet[8] after a 2007 prescription. He asserted that he got off Percocet by going "cold turkey." But the father also testified that he had used Percocet eight to nine months before trial in this case. The father told the court that he was unwilling to engage in services because he "was on drugs" during the dependency. The father testified to the foregoing without asserting his Fifth Amendment right to remain silent.

Further, the father also had identified parental deficiencies of untreated domestic violence and inadequate parenting skills. And while services were offered or provided by the Department for the father to address these deficiencies, he refused to engage in any of them.

Substantial evidence supports the finding that the Department proved by clear, cogent, and convincing evidence that the father was currently unfit to parent. And because the trial court's judgment was not based merely on the father's silence, any inference did not violate the Fifth Amendment.

We affirm.

_Mann, J._

WE CONCUR:

_Chung, J._                    _Hazelrigg, A.C.J._

---

[8] Percocet is a brand named prescription drug containing a combination of acetaminophen and oxycodone, an opioid pain medication.